Paul E. Jackson and Helen A. Jackson v. Commissioner.
Jackson v. Commissioner
Docket No. 43718.
United States Tax Court
T.C. Memo 1954-235; 1954 Tax Ct. Memo LEXIS 11; 13 T.C.M. (CCH) 1175; T.C.M. (RIA) 54341; December 27, 1954, Filed Murray Abrams, Esq., for the petitioners. James E. Markham, Jr., Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency in petitioners' income taxes for the year 1947 in the amount of $6,853.08. The questions to be decided are (1) whether petitioners' partnership is entitled to deduct certain expenditures incurred in connection with rental property for demolition, painting and repair during the year in controversy; (2) whether petitioners' partnership incurred a deductible loss due to the partial demolition of certain property in that year; (3) the extent, if any, to which petitioners' partnership incurred a storm casualty loss in connection with rental property during that year; (4) the extent, if any, to which petitioners are entitled to deduct a storm *12 loss in connection with their personal residential property during that year; and (5) whether petitioners' partnership is entitled to deduct one-fifth of the cost of a mink coat allegedly used in connection with their business, and being amortized over a 5-year period, during the year in controversy. Findings of Fact Some of the facts have been stipulated and are found accordingly. Paul E. Jackson, hereinafter sometimes called petitioner, and Helen A. Jackson, hereinafter sometimes called petitioner's wife, resided in Tuxedo Park, Orange County, New York, during the year in controversy. They filed a joint Federal income tax return for that year with the collector for the second district of New York. Petitioner and his wife held interests of 79 per cent and 20 per cent, respectively, in a partnership known as Jackson and Company, hereinafter called the partnership, with offices in New York City, during all times material herein. The partnership was engaged in business as advertising agents and investors during this period. A partnership return for the year 1947 was filed with the collector for the second district of New York. Petitioner was personally acquainted during the *13 years 1946 and 1947, with the members of the Board of Assessors of Orange County, New York, and was, prior to these years, a member of the Board. He was familiar with the operation of the Board of Assessors, including the way in which assessments were made and the fact that assessments were based on cubage. The partnership owned and managed real estate in Tuxedo Park, New York, prior to and during the year 1947. In or about November 1946, petitioner purchased from May G. Lorillard on behalf of the partnership certain real property consisting of land and a building situated in Tuxedo Park, hereinafter called the Lorillard property, for $10,000. The property was transferred to the partnership by Bargain and Sale Deed dated May 27, 1947. The building consisted of a main house, a dining room wing and a library wing, containing in all approximately 19 rooms. The property was located within a half-mile of petitioner's residence. At the time of the purchase of the Lorillard property, petitioner intended to demolish the library wing in order to reduce the total assessed valuation. The partnership planned either to subdivide the rest of the building into apartments for young people to *14 live in at moderate rent or to rent the property as a single unit. Early in 1947, petitioner spoke to the Board of Assessors of Orange County to attempt to get the assessment reduced on the Lorillard property. The Board of Assessors agreed to reduce the assessment proportionately in the amount of reduction in the cubage of the building that might result from the removal of any part of the building. In order to receive the benefits of the reduced assessment in 1947, it was necessary to begin the demolition work prior to July 1, 1947, when the field work of the Board of Assessors was completed. In order to reduce the assessed valuation on the Lorillard property, its library wing was demolished. The assessed valuation was reduced from $37,000 to $21,500 in 1947 and further reduced in 1948 to $15,500. The purpose of removing the library wing was to increase the probability that the Lorillard property would operate at a profit. It was anticipated that several hundred dollars would be saved in real estate taxes and that the salvage of the library wing and its contents would compensate for the cost of its removal. In addition to demolishing the library, the partnership made renovations *15 on the remaining part of the building after December 1946 to place the property in a condition suitable for rental purposes. The house was at least 47 years old and had been unoccupied for 2 or 3 years. This renovating work included the installation of a new water heater, screens, and window shades, as well as reconstruction of a driveway, garden and electrical installation. It also included wallpapering and painting. This work was performed in contemplation of rental use of the property. The partnership leased the premises as of October 1, 1947 for 3 years at $250 a month to a tenant. Painting and papering costs in the amount of $4,334.69 constituted the greatest part of the expense. The total amount expended was $6,343.76. The painting, decorating and paper hanging were begun in August 1947, and completed the end of October 1947. The tenant instructed the painting contractor as to the decorative scheme. The painting and redecorating were the usual type of work that would be done on property to prepare it properly for occupancy by a tenant. No building or other structure had been built in place of the library wing that was removed, at the time of the hearing herein. The library *16 wing was built at a cost of approximately $30,000 in the late 1920's. The proportionate unextinguished cost of the demolished library was not more than $2,000. Its salvage value was between $5,000 and $7,000. The cost of reproducing this library wing in 1947 would be about $60,000 to $70,000, using material of like kind and quality. The replacement cost of the Lorillard house, excluding the library wing was between $200,000 and $250,000 in 1947. The assessed valuation of the Lorillard property was allocated as follows: $1,500 to the land and the balance to the building. The cost of the removal of the library wing did not exceed $3,000. This amount was paid to the Tuxedo Building Company and Tuxedo Home Service for labor, trucking and material. On December 26, 1947, an unusually heavy snowstorm occurred at Tuxedo Park, New York, which damaged or destroyed many of the shrubs and evergreens on both the Lorillard property and residence of petitioners. The personal residence of petitioners was purchased in 1935 at a cost of $15,000. After the 1947 and 1948 storms, $4,250 was expended to place trees and shrubbery on the Lorillard property and the personal residence of petitioners. *17 The weight of the snow in the snowstorm of December 1947 resulted in the collapse of a garage made of corrugated iron on the Lorillard property. The garage had no cost basis. The Tuxedo Park, New York, area was subjected to a severe ice storm in January 1948. Petitioners claimed storm and freeze damage to their private property on their joint Federal income tax return for the calendar year 1948. In January 1947, the petitioner purchased a mink coat for his wife at a cost of approximately $2,500. The immediate occasion for acquiring the fur coat was a trip to the West Coast, where petitioners were to mingle with representatives of the National Distilleries Company and their wives. The coat was 7 years old at the time of the hearing herein, and still in excellent condition. No repairs have been made on it. The mink coat was worn by petitioner's wife on nonbusiness occasions. The partnership deducted one-fifth of the cost of the fur coat as an entertainment expense on its 1947 return. Opinion I. Petitioner's own testimony to the effect that salvage of the demolished library wing on the Lorillard property could be worth $5,000, $6,000 or $7,000 - all in excess of the unextinguished *18 cost which we have found as a fact [1] to have been no more than $2,000 - precludes not only the conclusion that a loss was realized from its destruction, but would also offset the entire cost of $3,000 which we have found to be attributable to the demolition. The burden being on petitioner, his own testimony must be construed as failing to show error in the deficiency. *19 Even if a loss or expense had been incurred, however, neither would be deductible. Where property is acquired with the intention of demolishing it in whole or in part in order to adapt it to the purchaser's use, no deduction is permissible. Robert B. Griffin, 17 B.T.A. 255; Eaton v. Commissioner, ( C.A. 9) 95 Fed. (2d) 628. Petitioner, a former member of the County Board of Assessors, must have known that his aim to reduce the assessed valuation of the Lorillard property for local real estate tax purposes could be achieved solely by a reduction in its total cubage. We are satisfied from the record that he intended the library demolition at the time of the original purchase, and we have made our findings accordingly. The mere fact that the demolished section was not replaced "does not necessarily mean that the removal * * * did not make the land more valuable for some other purpose." Robert B. Griffin, supra, p. 256. Cases involving a partial demolition of operating business property due to a decrease in the scope of operations, such as First National Bank of Evanston, Wyo., 1 B.T.A. 9, *20 are as distinguishable here as they were in the Griffin case. II. All other expenses incurred by petitioner in preparing the Lorillard property for occupancy by a tenant, with the exception of expenditures for painting and wallpapering must also be denied deductibility as ordinary and necessary expense. Items such as driveway, garden, and electrical "repairs" were capital improvements resulting in "structural changes," despite their nomenclature. Cf. Chesapeake Corporation of Virginia, 17 T.C. 668. The cost of painting and wallpapering incurred under the supervision of the prospective tenant, however, falls into the category of ordinary and necessary redecorating expense. Salo Auerbach, 2 B.T.A. 67; Chesapeake Corporation of Virginia, supra.As to these two items, petitioner has sustained his burden. III. The deduction of one-fifth of the cost as depreciation of a mink coat supposedly acquired by petitioner's wife in connection with client relationships allegedly required by their partnership activities cannot be upheld. The garment was admittedly worn on social occasions unconnected with business and such personal expenses are denied *21 deduction by section 24, Internal Revenue Code of 1939. Except for situations involving special uniforms required by a business or occupation and not adaptable to personal use, cf. Marcus O. Benson, 2 T.C. 12, affd. (C.A. 9) 146 Fed. (2d) 191, the cost of ordinary clothing worn in connection with one's work may not be deducted, Louis Drill, 8 T.C. 902, at least unless that is its sole use. See Wilson John Fisher, 23 T.C. - (November 9, 1954). We are unable to support this drastic departure from authority and say that the purchase of a mink coat for his wife is an "ordinary" expense of the business engaged in by a public relations or advertising agent: "The line is not always an easy one to draw nor the test simple to apply. But we think its principle is clear. It may for practical purposes be said to constitute a distinction between those activities which, as a matter of common acceptance and universal experience, are 'ordinary' or usual as the direct accompaniment of business pursuits, on the one hand; and those which, though they may in some indirect *22 and tenuous degree relate to the circumstances of a profitable occupation, are nevertheless personal in their nature, of a character applicable to human beings generally, and which exist on that plane regardless of the occupation, though not necessarily of the station in life, of the individuals concerned." * * * [Henry C. Smith, 40 B.T.A. 1038, 1039, affd. (C.A. 2) 113 Fed. (2d) 114.] Respondent's determination must be affirmed as to this issue. IV. Petitioner also seeks two casualty loss deductions for the year in controversy as a result of storm damage to trees, shrubbery, and landscaping both on the Lorillard property and on his personal residence property. The amounts claimed are based solely on testimony of a local nurseryman as to the cost of replacing the destroyed parts of the respective properties. Respondent denies that the damage in controversy has been shown to be attributable to the storm of December 1947 - the year in controversy - as alleged by petitioner, rather than by subsequent ice and snowstorms which occurred early in 1948. Assuming, without deciding, that the damage has been traced adequately to the year in controversy we cannot determine *23 the extent of the respective losses, if any, from the record before us. Casualty damage is measured by the decline in the value of the property from that immediately prior to the damage, the loss in value less salvage and insurance measuring the deduction if not in excess of basis which ordinarily, and in this case, would be cost. Helvering v. Owens, 305 U.S. 468; Pioneer Cooperage Co., 17 B.T.A. 119, affd. (C.A. 8) 53 Fed. (2d) 43, certiorari denied 284 U.S. 686; Mayer v. United States, (Ct. Cl.) 115 Fed. Supp. 171; I.T. 4032, 1950-2 C.B. 21. Although evidence of the cost of replacement or repairs has been admitted to corroborate the extent of loss, as where the loss has been otherwise established so as to insure that the repairs did not exceed the loss actually suffered, see W. F. Harmon, 13 T.C. 373; Mary Cheney Davis, 16 B.T.A. 65, the cost of repairs and replacement alone cannot sustain petitioner's burden in this case, Samuel Greenbaum, 8 B.T.A. 75; Joseph E. Hubinger, 13 B.T.A. 960, *24 affd. (C.A. 2) 36 Fed. (2d) 724, certiorari denied 281 U.S. 741, especially since, as to the Lorillard property, the estimated cost of replacing damaged trees and shrubbery alone is more than seven times the amount allocated to the entire cost of the land [2] and no detailed criteria are in evidence as a basis for determining the aliquot cost of the land surrounding petitioner's residence. See Mrs. Anne B. Richardson, 1 B.T.A. 576. Accordingly, respondent's disallowance of both casualty losses is sustained. Decision will be entered under Rule 50. Footnotes
1. We have arrived at the cost of the library wing by using petitioner's figures of reproduction cost of the library and of the balance of the building and comparing these to petitioner's actual cost after deducting $400 for the cost of the land. The latter amount was arrived at by taking the respective proportions of land and improvements from the assessment figures, which are the only evidence in the record from which an allocation can be made. Joseph F. Cullman, Jr., 16 BTA 991. See Barbara Konold, 9 BTA 1194↩. Even, however, if we accept petitioner's computation of about $4,000 for the cost of the library wing there would still be no loss assuming his higher figure of $7,000 for salvage value. In these computations no cost has been allocated to the garage since none has been shown.
2. See footnote 1, supra.↩