532 F.2d 1021
 76-1 USTC P 9462, 1 Employee Benefits Ca 1110
 SUBSCRIPTION TELEVISION, INC., Successor By Merger to John
Blue Company, Inc., Subscription Television, Inc., Successor
By Merger to Blue Equipment Company, Inc., Subscription
Television, Inc., Successor By Merger to Rex, Inc.,
Subscription Television, Inc., Successor By Merger to Blue
Company, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 74-3145.
 United States Court of Appeals,
Fifth Circuit.
 June 7, 1976.
 
 Donald W. McCoy, Fayetteville, N. C., for petitioners-appellants.
 Scott P. Crampton, Asst. Atty. Gen., Myron C. Baum, Deputy Asst. Atty. Gen., Tax Div., U. S. Dept. of Justice, Washington, D. C., Gilbert E. Andrews, Jr. Acting Chief, Leonard J. Henzke, Jr., Atty., Michael J. Roach, Atty., App. Section, Tax Div., Dept. of Justice, Washington, D. C., Meade Whitaker, Chief Counsel, Michael Zimmerman, Atty., Internal Revenue Service, Washington, D. C., for respondent-appellee.
 Appeals from the Decisions of the Tax Court of the United States (Alabama Case).
 Before GOLDBERG, DYER and SIMPSON, Circuit Judges.
 SIMPSON, Circuit Judge:
 
 
 1
 Subscription Television, Inc. (taxpayer) appeals from the June 6, 1974 decisions of the United States Tax Court which determined deficiencies in the total amount of $47,589.29 against it, as successor by merger to each of four predecessor companies, John Blue Company, Inc., Blue Equipment Company, Inc., Rex, Inc. and Blue Company.[1] We affirm the ruling of the Tax Court.
 
 I. THE FACTS
 
 2
 The facts, as stipulated by the parties and as found by the Tax Court, are stated in the Commissioner's brief as follows:
 
 
 3
 "On July 10, 1967, Subscription Television, Inc. (taxpayer), purchased all the issued and outstanding stock of nine affiliated companies, which together comprised the John Blue Group of companies. (R. 45-46, 54.) These companies were merged into the taxpayer on August 1, 1967. (R. 54.) The companies thus acquired by the taxpayer included John Blue Company, Inc.; Blue Equipment Company, Inc.; Rex, Inc., and Blue Company. (R. 44.) John Blue Company, Blue Equipment Company, and Rex were each organized and incorporated as Alabama corporations with their respective principal places of business in Huntsville, Alabama; Blue Company was organized and incorporated as an Illinois corporation with its principal place of business in Clinton, Illinois. (R. 44-45.) All four corporations kept their books and filed their tax returns on an accrual basis of accounting. (R. 44-45.)
 
 
 4
 "In 1951, the John Blue Company established a profit-sharing plan for its employees. (R. 46.) The plan was funded by a trust agreement executed by the John Blue Company and Birmingham Trust National Bank, as trustee, and entitled, 'The John Blue Company, Incorporated, Employees Profit Sharing Trust.' (R. 18, 46.) Among other things, the trust agreement provided as follows with respect to contributions to the trust by the company (R. 18):
 
 
 5
 'ARTICLE VII
 
 CONTRIBUTIONS TO TRUST BY COMPANY
 
 6
 Section 1. Subject to such amendments as may be made hereto as permitted by Section 3 of Article IX of this Agreement, the Company intends to make annual contributions to the Trust Fund by annual payment to the Trustee of the amounts herein agreed to be paid by the Company but does not bind itself so to do after May 31, 1961, and does not enter into any controlling liability so to do thereafter.'
 
 
 7
 "On June 18, 1951, the Commissioner of Internal Revenue issued a determination letter stating that this trust agreement was an exempt profit-sharing trust under the provisions of Section 165(a) of the Internal Revenue Code of 1939.[3] (R. 46.)
 
 
 8
 "In 1959 the John Blue Company and the Birmingham Trust National Bank executed an agreement amending certain provisions of the John Blue Company's profit-sharing trust in order to permit, among other things, any company affiliated with the John Blue Company through common ownership of stock or as a controlled subsidiary to be included as an additional employer under the agreement by adopting the agreement and making the first annual deposit under it. (R. 49-52.) Article II, Section 1, of the amended John Blue Company profit-sharing trust agreement provided as follows (R. 49-50):
 
 
 9
 ' * * * The Company or any other corporation which may become a party hereto * * * agrees to deposit with the Trustee (within a period of time following the end of the fiscal year of the Company or such other corporation permitted by the United States Internal Revenue Code to allow the deduction of such amount) an amount of net earnings of the Company or of such other corporation as may be determined by the Board of Directors of such other corporation prior to the end of such fiscal year but in no event an amount less than the amount computed as follows:
 
 
 10
 * * * 't a
 
 
 11
 "On April 28, 1961, the District Director of Internal Revenue in Birmingham, Alabama, issued a determination letter stating that the trust agreement, as amended, met the requirements of Section 401(a) of the Internal Revenue Code of 1954, and that the profit-sharing trust continued to be exempt under Section 501(a) of the Code. (R. 49.) On June 1, 1964, Blue Equipment Company, Inc., adopted and became a party to this trust agreement.[4] (R. 52.)"In 1965, Rex, Inc., and the Birmingham Trust National Bank executed a trust agreement similar to the one between the John Blue Company and the Birmingham Trust National Bank discussed above, except that it employed a somewhat different contribution formula from that used in the John Blue Company trust. (R. 53-54.) This agreement, entitled 'John Blue Associates Profit Sharing Trust' provided as follows with respect to contributions by the Company (R. 22, 24):
 
 
 12
 'ARTICLE VIII
 
 CONTRIBUTIONS TO TRUST BY COMPANY
 
 13
 Section 1. Subject to such amendments as may be made hereto as permitted by Section 3 of Article IX of this Agreement, the Company intends to make substantial and recurring contributions to the Trust Fund by annual payments to the Trustee but does not bind itself so to do and does not enter into any continuing liability so to do hereafter.'
 
 
 14
 "The Associates' Trust also contained a provision similar to Article II, Section 1, of the John Blue Company Trust, set forth supra, p. 4. Blue Company adopted and became a party to this trust agreement on October 1, 1965. (R. 53.) The District Director issued two determination letters, dated December 23, 1965, and January 30, 1967, respectively, with respect to this trust. (R. 53.) The first of these letters stated that the trust agreement met the requirements of Section 401(a) and that the trust was entitled to exemption under Section 501(a), and the second letter stated that the trust agreement as adopted by Blue Company continued to qualify under Section 401(a) and that the adoption of the agreement by Blue Company did not adversely affect the prior exempt status of the trust under Section 501(a). (R. 53.)
 
 
 15
 "The John Blue Company and Blue Equipment Company deducted $73,515 and $5,385.49, respectively, as accrued contributions to the John Blue Company profit-sharing trust on their corporate income tax returns for their taxable years ended May 31, 1967. (R. 55.) Rex and Blue Company deducted $18,255.71 and $2,006.88, respectively, as accrued contributions to the John Blue Associates profit-sharing trust on their corporate income tax returns for their taxable years ended July 10, 1967. (R. 55.) All four companies paid their respective contributions to Birmingham Trust National Bank, as trustee, within the time prescribed by law for filing their income tax returns, including extensions thereof. (R. 14, 55.)
 
 
 16
 "The Commissioner disallowed the deductions for these contributions to the two profit-sharing trusts (R. 56), and the Tax Court upheld the Commissioner's determination on the ground that the taxpayer's predecessors had not assumed any obligation to make their respective contributions to the trusts prior to the end of the taxable years in question (R. 56-57). As the Tax Court pointed out (R. 57), both trust agreements expressly disclaimed imposing any liability on the employer-contributors to make continuing contributions to the trusts, and there was no evidence that any of the corporations had, through their boards of directors, assumed any liability to contribute to the trusts for the taxable years in question. Accordingly, the Tax Court reasoned (R. 56-57), there was no accruable liability at the end of the taxable years involved and the grace period of Section 404(a)(6) of the Code did not apply. The Tax Court accordingly entered decisions in favor of the Commissioner and the taxpayer brings this appeal."
 
 II. THE TAX COURT DECISION
 
 17
 The Tax Court held that the taxpayer's predecessors were not entitled to deduct their contributions to their respective qualified profit-sharing trusts for their employees until the taxable years in which those contributions were paid, because the predecessors had not incurred any accruable liability to make the contributions prior to the end of the taxable years in which they sought to accrue and deduct them. It was not disputed in the Tax Court and is not disputed here that, in order to deduct contributions in the year in which accrual is sought (prior to payment thereof), the corporate taxpayer must have incurred a specific and determinable liability to make the contribution in the year of accrual, in accordance with Section 404(a)(6), Internal Revenue Code of 1954, § 404(a)(6) of Title 26, U.S.Code.[2]
 
 
 18
 The question raised by the taxpayer and decided adversely to it by the Tax Court, was whether the trust agreements and surrounding circumstances show the creation of such a liability in the year of attempted accrual.
 
 
 19
 Both agreements provided that "the Company . . . agrees to deposit with the Trustee . . . an amount . . . as may be determined by the Board of Directors . . . prior to the end of such fiscal year (of accrual) . . . but in no event an amount less than" a specified formula amount. The agreements provided also that "the Company intends to make annual contributions to the Trust Fund . . . but does not bind itself so to do . . ." Reading these provisions in the context of the complete agreements, the Tax Court determined that no liability arose under the trust agreements unless and until created by the boards of directors; it further found that there was no evidence of any such formal board action during the year of accrual involved here.
 
 
 20
 The Tax Court rejected the taxpayer's unsupported contention that the "intent" of the agreements was to create automatic yearly liabilities, relying instead upon the express language of the agreements. It distinguished its prior decision in Misceramic Tile, Inc. v. Commissioner, 27 T.C.M. 145 (1968). In that case on different facts, the Tax Court found, unlike here, that the trust agreement automatically created the liability without further action of the board of directors subject only to a reserved right to terminate the plan. The Tax Court noted that here the trust agreements themselves required affirmative board actions and disclaimed any automatic creation of liabilities, and held that such provisions could hardly be modified by the informal statements of John Blue III, an officer of each of the predecessors, to several employees of John Blue relied upon by taxpayer that the companies would make contributions. Holding that no specific and determinable liability was in fact created during the year of attempted accruals, the Tax Court disallowed the deductions.
 
 III. CONTENTIONS ON APPEAL
 
 21
 While taxpayer's arguments on appeal take a slightly different tack from the position it took before the Tax Court, the result is not thereby affected. Its contentions on brief and in oral argument are twofold.
 
 
 22
 First, it says, its contributions (to the employee profit-sharing plans) were deductible because they were made within the time allowed by § 404(a)(6) of the Internal Revenue Code and controlling regulations and rulings[3] to accrual basis taxpayers, and in accordance with duly qualified and established plans in existence at the end of each taxable period involved. The stipulated facts are asserted to show:
 
 
 23
 (a) that in each instance taxpayer was on an accrual basis;
 
 
 24
 (b) that as of the end of each taxable period in question there was in existence in respect to each of the four Blue companies a duly qualified employee profit-sharing plan which contained a formula for the computation of employer contributions; and
 
 
 25
 (c) that within the time for the filing of returns for such taxable periods the taxpayer made payments to the several plans in amounts computed in accordance with the several formulae and accrued these amounts on its books as current liabilities for such periods.
 
 
 26
 It is urged that by the clear terms of the several plans the formulae were "predetermined" and "definite" in the critical sense of manifesting an intention to be self-operating rather than that there should be a new formula determination each year as to whether contributions should be made, and if so, in what amounts. Reservations to the employer of the power to discontinue or modify set forth by each plan are said to be ineffective to relieve of liability inasmuch as such reserved powers were not exercised for the taxable periods in question.
 
 
 27
 This argument is made in reliance upon the holding of the Tax Court in Misceramic Tile, supra. We do not doubt the soundness of that case, nor that the general premise set forth by taxpayer may, under certain facts, prevail. But we do not view this case as one in which the failure to exercise the reserved powers controls whether liability was incurred.
 
 
 28
 It is well-established that an accrual taxpayer may deduct from his expenses approved items only when all events necessary to determine the (1) fact, and (2) amount of liability, have occurred. Section 1.461-1(a)(2) Tax Regs.; United States v. Anderson, 1926, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347; Joe Coker Pontiac, Inc. v. CIR, 1975, P 75-305, P-H Memo T.C.; Abingdon Potteries, Inc. v. CIR, 1973, 17 T.C. 668, 673. This requires a factual determination, dependent upon and determined by the facts of the individual case. Joe Coker Pontiac, supra. The Commissioner concedes that the second prong of the test set out, the events necessary to the determination of the amount of liability, have occurred and were fixed by provisions of the trust agreements specifying the intent to contribute "an amount (no) less than" a specified formula amount. It is the events necessary to establish the fact of liability, events necessarily precedent to the incurring of any liability, that the Commissioner argues are absent. After careful consideration of the facts and the applicable law, we discern no error in the finding by the Tax Court that the taxpayer had not properly accrued the expenses it deducted from its 1967 income tax.
 
 
 29
 Whether or not the Trust Agreements manifested an intention to be self-operating, is a decision we must reach upon examination of the plans as a whole, and not by limiting our scrutiny to one portion thereof. The factor emphasized by the taxpayer that the boards of the Blue Group companies did not exercise the powers expressly reserved by them to discontinue or modify the plans must be viewed in context, as a single segment only of the plans.
 
 
 30
 In Misceramic Tile, supra, the Tax Court determined that even though the taxpayer corporation reserved the right or option not to contribute to the approved pension plan[4] liability had accrued under the plan on the last day of the taxable year in question (enabling taxpayer to take advantage of the provisions of Section 404(a)(6) of the Code) because (1) the taxpayer had not exercised the reservations open to it, and (2) further, the fact that the board of directors of the taxpayer had routinely approved quarterly financial reports listing as current expenses the pro rata quarterly accrual of the amount determined through the provisions of the relevant pension plan. No such accruals occurred here. The taxpayer's failure to exercise the option to modify or withdraw from the plan, is considerably more significant under the facts in Misceramic Tile than under the facts of the instant case.
 
 
 31
 The plan in Misceramic Tile, a pension plan with a proper trust agreement, was determined to be tax exempt under Section 401(a) of the Code. Section 404(a) (6) fixes a grace period in which accrual taxpayers may contribute and deduct from their incomes accrued liabilities under both qualified pension and profit-sharing plans, subsequent to the close of the tax year for which the deductions are claimed. Pension plans are by no means, nevertheless, subject to all of the same regulations as are profit-sharing plans, and vice versa. A major difference is that contributions need not be made to a profit-sharing plan every year for the plan to retain its tax exempt status. See Section 404(a)(3) of the Code, and Income Tax Regulation Section 1.401-1(b)(2). In the case of a defined benefit pension plan, however, such as was involved in Misceramic Tile, in order to prevent the employer being deemed to have abandoned the plan, an actuarially computed minimum amount must be contributed to the trust in order to prevent the unfunded past service cost at any time from exceeding the unfunded past service cost as of the date the plan was adopted. Income Tax Regulation Section 1.401-6(c)(2)(ii). As a practical matter then, unless a surplus was contributed to the plan in prior years, an employer must pay an annual minimum amount into a pension plan in order to maintain it. The Misceramic Tile plan set forth the general intent to contribute the amounts "actuarially necessary to provide the benefits under the plan". Misceramic's board of directors, by approving the financial statement which reflected the pro rata accrual of this actuarially necessary amount, acted inconsistently with any intent to discontinue the plan. But in this case there was no board approval of any expense accounting procedure reflecting the accrual of expenses under the profit-sharing plan. The Tax Court found "no evidence to indicate that the companies, through their boards of directors, assumed liability for the fiscal years in question". The consequences of the failure of the companies to contribute in any given year was not, as in Misceramic Tile, inconsistent with the continued existence of the plans. The effect is to render of no particular significance under the circumstances here the fact that the companies did not expressly modify or discontinue the plans.
 
 
 32
 Taxpayer's dependence in this respect upon Misceramic Tile's holding fails. The controlling distinction between the two situations, as the Tax Court held, is that the profit-sharing plan here in question requires express affirmative action by the board before any liability accrues, whereas the Misceramic pension plan required no such specific action. The Tax Court's determination that the plans here required board action is consistent with a fair reading of the documents in question.
 
 
 33
 Taxpayer's second contention fares no better. It urges in this connection that accruable liability was created by circumstances outside the trust agreements, (a) either by the terms of the sales agreement between stockholders of the Blue Companies and Subscription Television, or (b) alternatively by representations by John Blue III, an officer of each of the four companies, to certain employees, to the effect that the profit-sharing plans of the John Blue Group would be continued after the merger of the group into the taxpayer.
 
 
 34
 The sales agreement between the stockholders of the Blue Group and Subscription Television provided in part:
 
 
 35
 "None of such companies will have as of the closing date any bonus, pension, profit sharing or other compensation agreements or plans, except as described in Exhibit D, and it will not enter into any such agreements or plans up to and including the closing date." (Exhibit D incorporated the employee profit sharing plans here under consideration.) (paragraph 3(k)(i));
 
 
 36
 and also
 
 
 37
 "No change shall be made affecting the personnel, compensation payments or banking arrangements of any of the John Blue Group except as otherwise provided for herein or as first approved in writing by Purchaser". (paragraph 12(b) (vi)).
 
 
 38
 Taxpayer urges that these portions of the sales agreement effectively fixed liability. The answer is a short one: regardless of any provisions of the sales agreement, the trust agreements of the profit-sharing plans required action by the boards of directors of the four companies. The taxpayer further argues that since all directors were selling shareholders they were thus parties to the contractual sales agreement. We are not advised how actions by board members in their capacities as shareholders could bind the several boards or in anywise meet the express requirements of the trust agreements.[5] The sales agreement language quoted is no more than a general expression of the intent of the parties to continue the status quo of the corporation. It does not meet the requirement of affirmative action by the boards necessary to establish liability under the profit-sharing plans within a given year.
 
 
 39
 Equally, John Blue III's informal statements to certain employees also lacked any standing or relevance whatever under the trust agreements, as a substitute for the one essential requirement for accrual of liability to contribute to the profit-sharing trusts. That necessary ingredient, we reiterate, was a determination by the board of directors of the contributing company, prior to the end of the fiscal year, to make a contribution to the trust in a determinable amount. Cf. Precision Industries, Inc., 1970, 64 T.C. 86.
 
 
 40
 The decision of the Tax Court was right. It is
 
 
 41
 AFFIRMED.
 
 
 
 [1]
 The memorandum opinion of the Tax Court (Judge Norman O. Tietjens) was filed April 30, 1974 and is reported at 33 T.C.M. 538
 
 
 [3]
 As amended by Sec. 162(a), Revenue Act of 1942, c. 619, 56 Stat. 798
 
 
 [4]
 In 1965 the John Blue Company trust agreement was again amended to permit any affiliated corporation adopting the agreement to modify any provision of the agreement as applied to itself or its employees. (R. 52.) The District Director issued a determination letter on June 29, 1965, stating that the trust agreement, as amended, qualified under Section 401(a), and, accordingly, the trust continued to be exempt under Section 501(a). (R. 52.)
 
 
 [2]
 Internal Revenue Code of 1954 (26 U.S.C.):
 SEC. 404 (as amended by Sec. 24, Technical Amendments Act of 1958, P.L. 85-866, 72 Stat. 1606). DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN.
 (a) General Rule. If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year:
 (3) Stock bonus and profit-sharing trusts.
 (A) Limits on deductible contributions. In the taxable year when paid, if the contributions are paid into a stock bonus or profit-sharing trust, and if such taxable year ends within or with a taxable year of the trust with respect to which the trust is exempt under section 501(a), in an amount not in excess of 15 percent of the compensation otherwise paid or accrued during the taxable year to all employees under the stock bonus or profit-sharing plan. If in any taxable year there is paid into the trust, or a similar trust then in effect, amounts less than the amounts deductible under the preceding sentence, the excess, or if no amount is paid, the amounts deductible, shall be carried forward and be deductible when paid in the succeeding taxable years in order of time, but the amount so deductible under this sentence in any such succeeding taxable year shall not exceed 15 percent of the compensation otherwise paid or accrued during such succeeding taxable year to the beneficiaries under the plan. In addition, any amount paid into the trust in any taxable year in excess of the amount allowable with respect to such year under the preceding provisions of this subparagraph shall be deductible in the succeeding taxable years in order of time, but the amount so deductible under this sentence in any one such succeeding taxable year together with the amount allowable under the first sentence of this subparagraph shall not exceed 15 percent of the compensation otherwise paid or accrued during such taxable year to the beneficiaries under the plan. The term "stock bonus or profit-sharing trust", as used in this subparagraph, shall not include any trust designed to provide benefits upon retirement and covering a period of years, if under the plan the amounts to be contributed by the employer can be determined actuarially as provided in paragraph (1). If the contributions are made to 2 or more stock bonus or profit-sharing trusts, such trusts shall be considered a single trust for purposes of applying the limitations in this subparagraph.
 (6) Taxpayers on accrual basis. For purposes of paragraphs (1), (2), and (3), a taxpayer on the accrual basis shall be deemed to have made a payment on the last day of the year of accrual if the payment is on account of such taxable year and is made not later than the time prescribed by law for filing the return for such taxable year (including extensions thereof).
 
 
 [3]
 Income Tax Regulations § 1, 404(a)(1)(c) which provides:
 "(c) Deductions under section 404(a) are generally allowable only for the year in which the contribution or compensation is paid, regardless of the fact that the taxpayer may make his returns on the accrual method of accounting. Exceptions are made in the case of overpayments as provided in paragraphs (1), (3) and (7) of section 404(a), and, as provided by section 404(a)(6), in the case of payments made by a taxpayer on the accrual method of accounting not later than the time prescribed by law for filing the return for the taxable year of accrual (including extensions thereof). This latter provision is intended to permit a taxpayer on the accrual method to deduct such accrued contribution or compensation in the year of accrual, provided payment is actually made not later than the time prescribed by law for filing the return for the taxable year of accrual (including extensions thereof), but this provision is not applicable unless, during the taxable year on account of which the contribution is made, the taxpayer incurs a liability to make the contribution, the amount of which is accruable under section 461 for such taxable year. See section 461 and the regulations thereunder. . . ."
 Revenue Ruling 63-117, which provides in part:
 "Treasury Decision 6189, C.B. 1956-2, 972, eliminated the requirement, previously contained in the regulations, for a definite predetermined employer contribution formula under a qualified profit sharing plan. Notwithstanding the elimination of this requirement, where a plan contains, as of the end of the taxable year of the employer, a definite formula for the computation of employer contributions, a liability accrues as of the end of such taxable year. . . ."
 Revenue Ruling 71-38, which provides in part:
 "The liability for a contribution is established by the terms of the plan itself to the extent that the contribution is called for by a definite plan formula for determining the profits to be shared. . . ."
 
 
 [4]
 The plan there under consideration provided that although the employer intended to make the contributions necessary under the plan, "it does not guarantee to do so" and that the "plan is entirely voluntary on the part of the Employer and the continuance of the plan and payment thereunder are not assumed as a contractual obligation of the Employer" who "does not guarantee or promise to pay or cause to be paid any of the benefits provided" but that "the Employer specifically reserves the right, in its sole and uncontrolled discretion, and by official and authorized act, to modify, suspend, in whole or in part, at any time or from time to time, and for any period or periods, or to discontinue at any time the contributions", and that "the Employer, by action of the Board of Directors, may suspend the payments to the trust for any year and may terminate this plan at any time". Misceramic Tile, supra, 27 T.C.M. at 145-146
 
 
 [5]
 It is of course fundamental that boards of directors can only act when assembled as such, and that they cannot act in an individual capacity outside of a formal meeting, so that the expressions of individual members become the action of the board. "The law, therefore, wisely places control of corporations in a board of trustees, and requires its action as a board". Ames v. Goldfield Merger Mines Co., W.D.Wash.1915, 227 F. 292, 301-302. See also Schuckman v. Rubenstein, 6 Cir. 1947, 164 F.2d 952, cert. denied 1948, 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151